UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE SEARCH OF:<br><br>Black iPhone with cracked screen in black case. Model: A1784, seized on 10/2/19 from Matthew MOI | ) ) ) ) CASE# C:19-MJ-00476DMS ) ) ) ) ) |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Dale Boothroyd, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, to wit, one (1) cellular telephone:

2. Black iPhone in black case with cracked screen, Model: A1784, seized on 10/2/19 from Matthew MOI. (TARGET DEVICE)

3. The information to be searched is described in the following paragraphs.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code 841 (a) (1) and 846, have been committed and that the items described in Attachment A are evidence, fruits, instrumentalities, and proceeds of those violations are located at the location described in the

1

OCT 2 9 2019

accompanying search warrant. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## AGENT'S BACKGROUND

I, Dale Boothroyd, am a Task Force Officer with the Drug Enforcement Administration (DEA), in the Anchorage, Alaska, District Office, and in that capacity declare and state as follows:

5. I have been employed as a Task Force Officer with the Drug Enforcement Administration since October of 2018. Prior to my assignment with the Drug Enforcement Administration, I was assigned to the Statewide Drug Enforcement Unit with the Alaska State Troopers from April 2018 to September 2018. Prior to my assignment with AST, I was assigned to uniformed patrol with the Anchorage International Airport Police/Fire Department for six years. Thus, in total I have approximately 7.5 years of law enforcement experience.

6. During the course of your affiant's law enforcement career, I have written and/or executed numerous search and seizure warrants for narcotics, dangerous drugs, and related records, and assisted in the seizure of hundreds of thousands of dollars in proceeds and/or assets derived from such illegal activity.

7. During the course of my employment as a Law Enforcement Officer, I have gained experience in conducting drug investigations and have received the benefit of many years of such experience of fellow agents, investigators and officers.

8. During the course of my employment with the these three agencies, I have worked in an undercover capacity and conducted investigations of controlled substances violations in conjunction with agents, investigators and officers from other jurisdictions. I have also worked with and conducted investigations utilizing confidential sources. I have also conducted or assisted in investigations which have led to the arrest and conviction of persons for violations dealing with the sale, possession and/or manufacture of controlled substances, and the seizure and forfeiture of assets. As part of these investigations, I have able to interview arrested subjects and their associates. Through these interviews, your Affiant has learned how and why these offenders conduct various aspects of their drug trafficking activities, to include

2

OCT 2 9 2019

communicating, manufacturing, packaging, distribution, transportation and concealment of controlled substances and assets and money laundering.

9. I attended the Alaska Law Enforcement Training Academy #12-02 where I received 947 hours of training. I have obtained my Intermediate Police Certificate from the Alaska Police Standards Council. I have attended a 40 hour "Jetway" training course presented by the Drug Enforcement Administration and El Paso Intelligence Center. I have attended a 40 hour "Undercover Survival and Tactics" course present by the Midwest Counterdrug Training Center. I have also attended a 7 hour course on Drugs in Alaska at the State Crime Laboratory. I have obtained an A.A.S degree from Finger Lakes Community College, graduating in 2009 with a major in Conservation Law Enforcement.

10. Based upon my training, experience and participation in these and other financial/drug trafficking investigations, and based upon my conversations with other experienced law enforcement agents and officers, with whom I work, I know the following:

    a. In my experience, I have found that the distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, such as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money. Such records may be found in the form of **text messages on cell phones, or emails on targets' computers, tablets, digital cameras or other portable media devices, or smart phones.**

    b. It is common for members of drug trafficking organizations to maintain records evidencing their illegal activities including books, ledgers, receipts, notes and other papers

relating to the transportation, ordering, possession, sale and distribution of drugs and the collection and transportation of drug proceeds. I also know that the aforementioned records are frequently maintained in the drug trafficker's residence and sometimes in the traffickers' vehicle(s), **computers, tablets, smart phones, digital cameras or other portable media devices.**

c. I know that evidence of excessive wealth is probative evidence of crimes involving greed, to include the distribution of controlled substances. Therefore, receipts showing the expenditure of large sums of money and/or the expensive assets themselves are evidence of drug trafficking. I also know that drug traffickers commonly keep the expensive assets themselves and/or documentation of the purchase of the asset (receipts, warranty cards, etc.) in or about their residences, and sometimes in their vehicles, businesses, **smart phones, tablets, computers or portable media devices.**

d. It is increasingly common for members of drug trafficking organizations to utilize direct cash deposits into a co-conspirator's bank accounts to facilitate the movement of U.S. currency throughout the trafficking organization's area of operations. I know that members of drug trafficking organizations will utilize nominee depositors to disguise the origination of the funds and to break up the amount being deposited by any one person. I know that the actual owner of the currency will commonly provide the nominee depositor with handwritten information concerning the intended recipient's name and account number and amounts of money to be deposited. I also know that, in an attempt to keep track of the proceeds, it is common for the drug traffickers and/or nominee depositors to maintain copies of the deposit slips. I also know that the aforementioned items are frequently maintained in the drug traffickers' and/or nominee depositor's residence, businesses, or vehicles. In addition, drug traffickers can keep such records on their **smart phones, tablets, computers, or portable media devices.**

e It is common for members of drug trafficking organizations to utilize fraudulent identification in order to purchase airline tickets, send wire transfers, rent residences and storage facilities, and subscribe for telephone/cellular telephone service. I also know that

4

it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, or vehicles. Records concerning the purchase of airline tickets, rental contracts, and telephone/cellular service are frequently found on the **smart phones, tablets, computers, or portable media devices.**

f. It is common for drug trafficking organizations involved in the distribution of controlled substances to maintain equipment and supplies (i.e. scales, baggies, cutting agents) on hand over a lengthy period of time. At times, certain retail stores provide customers with loyalty cards that can track a customer's purchases. Frequently, these stores send emails to the members of their loyalty programs that can be found on drug traffickers' **computers, tablets, and smart phones.**

g. It is common for members of drug trafficking organizations to attempt to recruit couriers to transport drugs and/or U.S. currency throughout the trafficking organization's area of operations. I know that often times a courier's handler will provide the courier with handwritten notes regarding travel itinerary, hotel information, and contact telephone numbers prior to the courier's departing on the trip to transport drugs and/or money. I also know that oftentimes organizations will pay a flat rate (i.e. $1,000 per kilogram of cocaine) plus expenses for the couriers. Therefore, oftentimes the couriers will keep handwritten itemized lists of expenses and/or receipts, in order to be reimbursed. I also know that the aforementioned items are frequently maintained in the couriers' residence or residences and vehicles belonging to members of the drug trafficking organization. In addition, records of airline and hotel purchases are frequently found in email on drug traffickers' **smart phones, tablets, computers, digital cameras or other portable media devices.** Evidence of visiting travel websites can often be found through forensic analysis of these devices.

h. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken,

5

OCT 2 9 2019

photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). I also know that the aforementioned items are frequently maintained in drug traffickers' residences or businesses, or in their **computers, tablets, smart phones, digital cameras and other portable media devices.**

i. It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that oftentimes the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. Analyses of these pre-paid cellular phones often provide evidence of a drug trafficker's customers and suppliers, as well as accomplices. This information typically can be found in the address books, call logs and text messages of **wireless cellular telephones, smart phones, computers, tablets and portable media players.**

j. It is common for members of a drug trafficking organization to attempt to legitimize their profits from the distribution of drugs. To accomplish these goals, drug traffickers utilize foreign and domestic banks and the bank's attendant services to include cashier's checks, safe deposit boxes, and money drafts. Drug traffickers will also utilize the purchase/sale of real estate to legitimize their profits. I also know that the records of the aforementioned transactions are frequently maintained in the drug trafficker's residence, business, or vehicles, and also stored on computers, **portable media devices**, and tablets of drug traffickers.

k. It is common for members of drug trafficking organizations to utilize businesses, both real and fictitious, to conceal both the distribution of drugs as well as to conceal the source of their illegal income. It is common for drug traffickers to possess business licenses and articles of incorporation for these businesses, even if the businesses exist only on paper. I also know that these records and documents are frequently maintained in the drug trafficker's residence or business, as well as on drug traffickers' computers, **portable media devices, and tablets.**

OCT 29 2019

6

Case 3:19-mj-00476-DMS   Document 1-1   Filed 10/29/19   Page 6 of 14

l. In my experience, I have found that the same information or data can be restored/recovered from a forensic examination of a computer as you will find following an examination of portable media devices such as thumb drives, removable hard drives, or even digital cameras. This rationale is true mainly because devices such as thumb drives and removable hard drives may be used to save computer internal hard drive space and the data or information maintained within is more commonly pulled from a computer to begin with.

m. The statutory provisions to which the current investigation relates include; (1) Title 21, United States Code, Section 841 (a) (1) and 846, the Distribution of Controlled Substances, the Possession of Controlled Substances with Intent to Distribute, as well as the conspiracy to commit those violations, and (2) Title 18 United States Code Sections 1956, 1957, Money Laundering, and conspiracies to do the same and aiding and abetting the same. I am familiar with the provisions of these statues and based upon my training and experience, I believe that the data described in this affidavit and which is sought by this application for search warrant is evidence of violations under Title 21, United States Code, Section 841 (a) (1) and 846 and Title 18 Sections 1956 and 1957.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

11. The following is a summary of the property to be searched, and the general place where each device was recovered. The seizure of each device is more fully set forth in subsequent paragraphs.

12. A Black iPhone in a black case, Model: A1784 (TARGET DEVICE). The TARGET DEVICE is currently located at the DEA Anchorage District Office.

OCT 2 9 2019

## BACKGROUND OF INVESTIGATION

13. On September 25, 2019, Postal Inspectors identified Priority Mail Parcel 9505 5152 6932 9266 2901 96 (herein after referred to as Subject Parcel) addressed to "Trevor Harker, 985 N Helen Ln, Wasilla, AK 99654" from "Ramona Smith, 317 W 89th St Apt #6, Los Angeles, CA 90003" as being suspicious by utilizing postal databases and intelligence.

14. On September 25, 2019, a Federal Search Warrant was executed on the Subject Parcel. The Subject Parcel was found to contain approximately five kilograms (5,052.12 gross grams) of a dark brown colored, hard substance which field-tested positive for heroin.

15. On September 26, 2019, law enforcement conducted a controlled delivery of the Subject Parcel in Wasilla, AK of a parcel that previously contained 5 kilograms of heroin. Officers determined that Jordan SHANHOLTZER and Matthew MOI coordinated the shipment of the drugs

16. On September 26, 2019, AST DACI-19-03 (herein after CI) told investigators that the Subject Parcel came from "Matt Matt," known to investigators as Matthew MOI. MOI was saved in the CI's phone as "Cuzz." The phone number 907-342-7580(herein after Target Cell Phone 1) was saved in the CI's phone as "Cuzz."

17. The CI has prior felonies and no violent crimes in his/her criminal history and is cooperating in the hopes of mitigating any future federal charge(s) under Title 21, United States Code, Sections 846, 841(a)(1) and 841 (b)(1)(A). The CI's reliability had been corroborated through several DEA enforcement operations and debriefs.

18. On September 26, 2019, the CI showed investigators text messages between the Target Cell Phone 1 (MOI) regarding the Subject Parcel. On September 23, 2019, the Target Cell Phone 1 (MOI) sent a message asking for an address. The CI provided the address and name that was on the Subject Parcel. The Target Cell Phone 1 (MOI) then sent the CI a photo of the Subject Parcel, the label on the Subject Parcel, and the receipt provided by the Post Office for the Subject Parcel.

19. On September 26, 2019, law enforcement showed the CI a photograph of SHANHOLTZER. The CI advised law enforcement that the photograph shown to him/her was of the individual he/she knows as Jordan SHANHOLTZER. In addition, the CI described having a personal relationship going back approximately three years with SHANHOLTZER, including in-

*[Handwritten annotation:] The CI has one prior felony conviction for scheme to Defraud. The CI has pending drug charges for which he/she is hoping to mitigate the impact.*

person interactions. The CI stated he/she has worked with SHANHOLTZER and MOI to organize the shipments of approximately 12-14 multi-kilogram drug shipments via US Mail to Alaska.

20. On September 27, 2019, The CI called the Target Cell Phone 2 (SHANHOLTZER) and SHANHOLTZER ordered the CI to deliver 3 kilograms of heroin to an individual in Anchorage, and receive money from this individual in exchange for the heroin. Agents later identified this individual as Myrick ELLIOTT.

21. After the exchange with ELLIOT, SHANHOLTZER ordered the CI and MOI to drop their cell phones for new ones.

22. On September 29, 2019, investigators showed the CI a photo of MOI. The CI confirmed that was the person he/she knows as MOI and has been contacting him at the Target Cell Phone. The CI told investigators that he/she has been conducting FaceTime calls with MOI as recently as September 28, 2019, and that the individual in the FaceTime calls is the individual (MOI) who investigators showed the CI a photo of. The CI stated he/she has known MOI personally for two and half years.

23. On 10/2/19, Agents with the Anchorage district office coordinated with Agents from the SWB-2 in Los Angeles in conducting the takedown of Matthew MOI. MOI had an active arrest warrant (03:19-MJ-00426DMS) for drug conspiracy within the SHANHOLTZER DTO.

24. At approximately 0900 hours, Agents conducted surveillance at 7427 S. Figueroa Street, Los Angeles, the suspected residence of MOI. Upon arrival at the complex, Agents observed and positively identified MOI within the gated complex. Agents observed MOI conduct multiple suspected hand to hand drug transactions at the apartment complex. At approximately 1140 hours, Agents observed MOI leave the complex on foot. MOI was taken into custody near his residence without incident. MOI had two cell phones on his person at the time of his arrest. A black iPhone with a cracked screen (Model #A1784) and a black and red colored iPhone with a cracked back side of the phone in a black case. The cell phones were seized and transported to the Anchorage DO by TFO Boothroyd, where they were placed in temporary storage via CERTS pending search warrant application.

25. Based on my training and experience, and involvement in this investigation, your affiant knows that drug traffickers commonly use cellular phones to communicate with their criminal associates; telephonically and via text. Cellular phones used by drug traffickers and associates frequently contain evidence regarding the dates and times of the calls to and from

criminal associates as well as stored information regarding the telephone numbers, names, alias names, and saved text messages (both sent and received) to and from their criminal associates. Cellular telephones often contain video and photographs of criminal associates, illegal substances, locations and other evidence pertinent to this investigation.

26. Your affiant believes that Matthew MOI used the TARGET DEVICE in furtherance of violation of Title 21 USC 846, 841(a)(1) and (b)(1)(B).

27. Based on the information provided herein, I submit there is probable cause to search the TARGET DEVICE.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

1. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

2. Regarding the TARGET DEVICE, there is probable cause to believe that things that were once stored on this Device may still be stored there, for at least the following reasons:

3. Based on my knowledge, training, and experience, and based upon my communications with law enforcement personnel with specialized technical expertise, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not

10

OCT 2 9 2019

actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

4. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

5. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

6. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

7. Forensic evidence. As further described in <u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS,</u> this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store

11

configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when they were used.

d. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when it was used, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

8. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but

OCT 2 9 2019

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

9. Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

10. Based on my training, experience, and research, I know that the Devices have the capabilities that allow them to serve as a wireless telephone, a digital camera, a portable media player, a GPS navigation device, and a PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET DEVICE, which is described in IDENTIFICATION OF THE DEVICES TO BE EXAMINED, in order to seek the items described in ELECTRONIC STORAGE AND FORENSIC ANALYSIS.

Respectfully submitted,

TFO Dale Boothroyd
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me

OCT 2 9 2019

13

Case 3:19-mj-00476-DMS   Document 1-1   Filed 10/29/19   Page 13 of 14

on  10/29/19

_____
CHIEF UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The TARGET DEVICE is a Black iPhone with cracked screen in black case (case not pictured). Model: A1784. Located in the designated evidence storage facility at 1630 E Tudor Rd., Anchorage, AK.



OCT 2 9 2019